Williams, Judge,
delivered the opinion:
The question at issue in this case is the extent of the liability of the United States as trustee of the plaintiffs, the Delaware Tribe of Indians, under the provisions of article 7 of the treaty of May 6,1854.
The case is before the court by virtue of the act of February 7, 1925 (43 Stat. 812), as amended by the act of March 3, 1927 (44 Stat. 1358), wherein jurisdiction is conferred on the court to consider all claims of whatsoever nature of the Delaware Tribe of Indians against the United States, “ de novo, upon a legal and equitable basis, and without regard to any decision, finding, or settlement heretofore had in respect of any such claim.”
Prior to 1854 the plaintiff tribe was the owner of a reservation in Kansas. Under date of May 6, 1854 (10 Stat. 1048), a treaty was made, and by its terms the plaintiffs were required to remove to Oklahoma, to cede their lands in Kansas to the defendant so that they could be sold and the funds received could be used for the plaintiffs’ benefit. Under Article YII of the treaty provision was made for the sale of the Kansas lands and for the setting up of a permanent fund with the proceeds from the sale and for the expenditure of the annuities on the plaintiffs’ behalf. The defendant was charged with the duty of selling the land, of administering the fund, and in connection therewith it was provided that the funds might “ be invested by the President of the United States in safe and profitable stocks, the principal to remain unimpaired * *
*492 Article VIII gave authority, in the initial stages, to the President to determine how much of the money received should be paid out for the benefit of the plaintiff tribe and how much should be invested, but the treaty reserved to Congress the authority “ at any time, and from time to time, by law [to make] such rules and regulations in relation to the funds arising from the sale of the said lands, and the application thereof for the benefit and improvement of the Delaware people, as may in the wisdom of that body seem just and proper.”
Under Article XV there was an implied obligation upon the defendant to make further provision for the promotion of the plaintiffs’ “ interest, peace, and happiness * * * ” if “ from causes from which ” it could not then “ be foreseen ” the returns from the contemplated sale of their lands proved insufficient to effect the main purpose of the treaty provisions.
In other words, it was provided in substance that the plaintiffs should remove to Oklahoma; that their Kansas lands should be sold for their benefit; that the defendant should act on their behalf, administer the funds received from the sale of the land, and as trustee should obligate itself to maintain the principal unimpaired.
In due course thereafter the plaintiff tribe moved to Oklahoma, the Kansas lands were sold, and a very large sum was received by the defendant’s officials and was in turn invested as required. Part of the plaintiffs’ fund, the part in controversy here, amounting to $423,999.27, was invested in the bonds of the States of Missouri, North Carolina, and Tennessee, bearing six per cent interest and of the face value of $514,000. These bonds, with all of the other bonds held in similar trusts for other Indian tribes, were under the administrative control of the Secretary of the Interior and in the custody of a clerk charged with the detailed duties of administration of the various funds to which they belonged. Some time in 1859 the clerk in question absconded, taking a number of bonds, including, as is contended by the defendant, the bonds of Missouri, North Carolina, and Tennessee, that had been purchased for the plaintiffs with the funds held in their trust.
*493 After an investigation of the theft and an examination of the records of the Interior Department by a committee appointed by the Secretary of the Interior, and by a legislative committee, Congress, by its act of July 12, 1862 (12 Stat. 539), appropriated a sum equal to the amount expended from the plaintiffs’ funds for the bonds in question and directed that it be credited to the plaintiffs’ account “ for and in place ” of the bonds lost, and providing that the appropriation should thereafter bear interest at five per cent, but it was also required that the plaintiffs, before receiving the benefits of the appropriation, should first file their written consent to the terms of the proposed settlement with the Secretary of the Interior.
The plaintiffs on September 22, 1862, executed and filed the required written assent.
The first question for determination, therefore, is the exact and intended limits of the defendant’s obligation as trustee under the treaty of 1854. Whether by the provisions of Article YII the defendant obligated itself to maintain unimpaired the face value of the securities in which the funds to be received would be invested or was limited merely that the sum invested should not be impaired.
In the present action the plaintiffs contend that the securities purchased with their funds, but not the funds, constitute the trust property for which the defendant is responsible and must account; that the defendant’s trust obligation made it accountable to the plaintiffs for the face value of the securities in which their funds had been first invested, regardless of any theft of the securities, or possible diminution of value in an existing market, or their complete worthlessness following repudiation.
A secondary contention made by plaintiffs is predicated upon the subsequent action of Congress in relation to those bonds of Missouri, Tennessee, and North Carolina that were held in similar trust for other Indian tribes and were not stolen, but were in due course repudiated by the States before maturity. Congress in the instances cited, appropriated and caused to be placed to the credit of the tribes in question, an amount equal to the face value of the bonds, with interest at six per cent. From this fact it is argued *494 that such action evidenced the true construction of the defendant’s trust obligation.
In addition, the plaintiffs contend that it has not been shown, and that there is no evidence of the fact that the stolen bonds had in reality been purchased with the plaintiffs’ funds, and that those not stolen had not been purchased for them.
This latter contention is somewhat in conflict with the principle supporting their primary contention, for, on the one hand, if defendant is responsible as a trustee to the extent that the plaintiffs contend, the identity of the bonds is of little consequence. On the other hand, the issue of ownership of particular bonds would preclude recovery except plaintiffs could establish such fact, at least to the extent of requiring the defendant to meet and rebut it.
However, the present action may well be considered and disposed of upon its merits, namely, whether the defendant is responsible for a contended-for balance of a trust fund, and interest for the past seventy years, under the provision of Article VII of the act of May 6, 1854 (10 Stat. 1048), by the terms of which the defendant agreed to receive and administer, on behalf of the plaintiffs, the funds received from the sale of certain lands, and to invest the same “ in safe and profitable stocks, the principal to remain unimpaired, * * * ” and in connection with which Congress appropriated, and caused to be placed to the plaintiffs’ credit, a sum of money equal in amount to the sums first received in the plaintiffs’ trust fund, invested in securities and subsequently lost by theft.
The plaintiffs’ contention is that the requirements of Article VII obligated defendant to maintain unimpaired the face value of the securities in which the principal had been first invested — that the provision, “ the principal to remain unimpaired,” can not be interpreted to mean the total sum¡ of money received from the sale of the land, or that the responsibility of the trustee was to be limited to the mere retention of the securities — but that the provision was intended to extend the trust responsibility to the repayment of the face value of any securities in which the *495 funds might be invested and under all circumstances, whether through loss of the securities, or diminution in value, or their worthlessness following repudiation.
A responsibility so far-reaching and unconditional can only be successfully urged if supported by clear and explicit provisions of such intent, or evidenced by the subsequent action of the parties in interest, indicative of their similar interpretation of the provisions.
The essence of the rule of responsibility of a trustee is directed to the preservation of the property constituting the trust, with appropriate leeway, as regards diminution of value, as the exercise of ordinary care, due diligence, and discretion can not guard against.
In the absence of specific provisions in the instrument creating the trust, the trustee’s responsibility is to be determined by the statutes covering trusts, and to be measured by his compliance with or failure to observe its requirements. But where the instrument of trust, as in this case, provides in plain, unmistakable terms, in relation to the subject matter of the trusts, that the funds “ shall * * * be invested * * * in safe and profitable stocks,” and with relation to the trustee’s responsibility that “ the principal to remain unimpaired,” there would seem to be no room for any doubt as to the limits of the authority or as to the responsibility assumed by the trustee.
The action of the Congress in the appropriations made in the act of 1862 and the acceptance by the plaintiffs of its terms, combat any contention other than that the responsibility of the trustee was interpreted at that time by the parties to the agreement to be limited to the preservation of the principal received in trust in the first instance. Plaintiffs’ present contention not only flies in the face of that principle but completely fails to support its rather strained interpretation by any evidence, documentary or otherwise, indicative of the intent and their contended for understanding of the parties in this regard.
On the other hand, it seems that the defendant has very convincingly established the interpretation of both parties to the applicable provision at the time the question arose, *496 and that the action taken under the provisions of the act of July 12, 1862 (12 Stat. 539), constituted not only a full and fair compliance with the provisions, but was the obvious intent of the treaty provision and was, in addition, intended to evidence an acknowledgment by the parties that the defendant had discharged its full obligation in this regard; for after adequate verification of the facts and a full disclosure to the plaintiff tribe, the condition precedent for a settlement was subscribed to by the plaintiffs.
The terms of the instrument of trust required that the trustee should invest the subject matter of the trust “ in safe and profitable stock ” and that the trustee should maintain the “ principal ” “ unimpaired.”
The terms “ safe and profitable stock ” and “ principal ” are not interchangeable and were, obviously, not intended to be. The clearly stated provisions of Articles VII, VIII, and XV bear all the earmarks of a carefully prepared instrument concerning a thoroughly considered subject matter and it must be assumed that the distinction was intended in the use of the terms regarding the character of the investment and the limits of the defendant’s responsibility in case of impairment, loss, or repudiation.
Following the discovery of the theft of the bonds and after protracted hearings by congressional committees and deliberation concerning the Government’s responsibility in the circumstances, Congress by the act of July 12, 1862 (12 Stat. 539), made provision for the full compliance with the requirements that the principal should “remain unimpaired,” there has been appropriated and paid a sum of money equal to the amount that had been lost by the theft, under a stipulation that “said sums are for and in place of the same amounts heretofore invested by the Government under treaty stipulations with the said tribes in the bonds of the States of * * * which were stolen while in the custody of * * * [the] late Secretary of the Interior in whose department they had been deposited for safekeeping,” there has been in due course, and very clearly, after due consideration, an acceptance by the plaintiffs on September 22, 1862, in writing, as provided by section 5 of the act, of the tender made by the defendant.
*497 In so far as the record evidence discloses the action of Congress was fully supported, and warranted the assumption and finding that the stolen bonds consisted in part of bonds, of the number and character noted in Finding VIII, the property of the plaintiffs. There were two investigations made — one by a committee appointed by the Secretary of the Interior, one by the House of Eepresentatives, and from the evidence then available, and after protracted hearings and due consideration the conclusion was reached that among the bonds lost were the bonds referred to, in which the plaintiffs’ trust fund had been in part invested.
These facts, in so far as the record evidence discloses, were made known to the plaintiff tribe and duly considered before assent to the basis of settlement.
The record evidence nowhere establishes the fact, or warrants the implication, that the real facts were withheld from the plaintiff tribe, or that they were beguiled into believing that the circumstances were other than those noted above, or that the terms of the treaty of 1854 and of the act of 1862, the trust terms and basis of settlement were submitted and explained to them in a manner that did not leave freedom of action, on their part, or with an understanding of the basis of the settlement, or reason for it, other than the true and intended understanding.
The facts established by the evidence of record permit of but one conclusion — that the intended trust x’elated to the preservation of the principal received from the sale of Kansas lands; that the securities in which a part of the plaintiffs’ funds were invested were stolen; that the Government was responsible to the plaintiffs to the extent of their invested funds; that Congress appropriated a sum equal to the sum involved; and that these facts were made known to the plaintiff tribe, who fully and with understanding, and in due form assented to the basis and to the manner proposed by the defendant for the discharge of its trustee obligations.
If the question of identity of the bonds is at issue, or material, a sufficient answer is to be found in the conclusion reached by Congress in the appropriation under the act of *498 1862, following the very searching investigation by' congressional committees of the records and officials of the Interior Department. There did not seem to be any doubt in the mind of the officials of the Interior Department, or of the members of the congressional committees of the fact that the lost bonds were in part the bonds for which plaintiffs’ funds had been used in the purchase — by some means, the details of which do not appear, the officials of the Interior Department were able to make up from departmental records two statements of the securities formerly in the custody of the absconding clerk, which entirely satisfied the members of the congressional committees and Congress, that the bonds in which a part of the plaintiffs’ funds had been invested were among the total missing securities.
There is no evidence of guesswork — the plaintiffs can point to nothing save the fact that few of the bonds held in the fund bore identifying marks and that the ledgers, in which all was recorded, did not contain any entry identifying any bond for a particular tribe.
On the other hand, it appears that the department’s records were sufficiently complete to have enabled the administrative authorities during the preceding years to collect and expend the exact amount of interest due each tribe, including the plaintiffs, from the bonds which had been purchased at varying dates with their funds. Findings V, VI, and VII note these facts in detail.
The evidence upon which the congressional committee based their reports, conclusions, and recommendations has not been put in evidence, and it does not appear what detail facts supported the conclusion set forth in the act of July 12, 1862, but apparently, as stated by defendant’s counsel, “Abstract B ” was made by the Interior Department officials after investigation and upon a careful examination of all the data and comparison of the records in the department which had been filed with the congressional investigating committee.
In the absence of something more ¡tangible and convincing than the plaintiffs’ very limited contention of failure of proof of identity of the bonds, it must be assumed that among the missing bonds were those referred to in Finding *499 VIII, for which an appropriation was made by Congress in its act of 1862.
Plaintiffs’ counsel also contends that the facts concerning the .loss of the bonds were misrepresented when the condition precedent to the settlement under the act of 1862 was complied with by plaintiffs, and that, due to the financial distress of the plaintiffs at that time, they executed the required assent.
This contention, so far as the evidence discloses, is entirely volunteered by plaintiffs’ counsel. The act of July 12,1862, noted that i,t relates “ to the trust funds of several Indian tribes invested by the Government in certain State bonds abstracted from the custody of the late Secretary of the Interior.” Article I directs that certain credits are to be made, “ which said amounts are for and in place of the same amounts heretofore invested by the Government under treaty stipulations with said tribes in the bonds of the States of Missouri, Tennessee, and North Carolina, which were stolen while in the custody * * etc. So far as the record evidence discloses the plaintiffs must at least have known that the bonds were taken from the Government’s custody under circumstances that made the Government liable; whether they were told that it was due to negligence or not would seem to be immaterial. As to the rest of the detailed shortcomings contended for by the plaintiffs, there is not a shred of evidence offered in support. For the same reason the contention of plaintiffs’ counsel in an effort to excuse the plaintiffs’ assent of September 22, 1862, must be ignored, as there is no proof of the fact that the plaintiff tribe was so destitute and suffering such financial embarassment as to compel a blind and unprotesfing assent, and there is not even those facts in evidence from which a fair inference of such a contingency can be drawn.
In urging the extreme interpretation of the defendant’s trust obligation, the plaintiffs’ counsel cites in support of evidence of understanding of the parties, of the trust provision, the action of the defendant in those other instances in which those bonds not stolen were eventually repudiated by the issuing States upon maturity, and which the defendant met by an appropriation of an amount equal to the face *500 value plus interest at 6%. Even if a fact and one of which this court should take judicial notice, it is not controlling in this instance. The basis of the present action is the respective rights and responsibilities of the plaintiffs and defendant under the terms of Article YII of the act of May 6, 1854. It does not appear whether the terms of the defendant’s responsibility in the other instances were identical or broader, nor does it follow that the action of a later Congress in a similar instance is more correctly interpretative of the true purpose and intent of the trust agreement, than that of an earlier Congress. In any event it is not controlling as regards the present issue.
The defendant has made full restitution to the plaintiffs of the entire amount of their funds invested in the abstracted bonds. The amount so invested was, we think, the principal which the defendant was required under article I of the treaty of 1854 to keep “ unimpaired.” The defendant has therefore fulfilled its duty and obligation assumed under the treaty. The plaintiffs suffered no loss by reason of the bond abstraction, as the full amount of their funds invested in such bonds was restored to them by the act of July 12, 1862.
The plaintiffs are not entitled to recover and their petition is hereby dismissed. It is so ordered.
Whaley, Judge; Littleton, Judge; Green, Judge; and Booth, Chief Justice, concur.